ANN ARBOR R. CO. et al. v. COMMISSIONER OF INTERNAL REVENUE.

No. 7397.

Circuit Court of Appeals, Sixth Circuit.

June 9, 1938.

L. H. Strasser, of St. Louis, Mo., and Gustavus Ohlinger, of Toledo, Ohio (N. S. Brown and L. H. Strasser, both of St. Louis, Mo., and Geo. H. Beckwith and Gustavus Ohlinger, both of Toledo, Ohio, on the brief), for petitioners.

Morton K. Rothschild, of Washington, D. C. (James W. Morris, Sewall Key, and Morton K. Rothschild, all of Washington, D. C., on the brief), for respondent.

Before HICKS, SIMONS, and HAMILTON, Circuit Judges.

SIMONS, Circuit Judge.

This review involves income taxes of the Ann Arbor Railroad Company and its subsidiary for 1920, asserted by the respondent and redetermined by the Board of Tax Appeals as a result of disallowance of maintenance expenditures on the ground they were made not with the funds of the roads but out of allowances by the Director General of Railroads for undermaintenance during government operation. The taxpayers contend they received nothing for undermaintenance, and the question is whether there was substantial evidence to sustain the redetermination of their taxes by the Board.

The railroad properties of the petitioners were under Federal control from

January 1, 1918, to February 29, 1920. It was the obligation of the United States to return them to their owners in as good physical condition as when taken, or to compensate them in damages for impairment. The Ann Arbor's claims, filed with the Director General of Railroads, included among other items damages for undermaintenance of ways, structures and equipment in the sum of $1,208,534.34, and a net balance due it of $603,601.26. The Lake Superior's claim contained an item for undermaintenance of ways and structures of $20,631.95, and a net balance due it of $69,079.98. While the petitioners had not entered into the standard agreement provided for by § 1 of the Federal Control Act, 40 Stat. 451, 452, it is conceded that their acceptance of benefits under § 2 brought them within the provisions of the statute.

The adjustments that were made with all the roads by the Railroad Administration at the termination of Federal operation were lump sum settlements in accordance with its theory of liability, adjusted to meet meritorious modifications developed at final hearing. In no instance was the carrier advised as to allowances made upon specific items claimed. In respect to claims of the carriers for undermaintenance the difficulty of agreeing upon rules which would bring about fair results caused the Government to insist, at least so far as the contract roads were concerned, upon applying the proviso of § 5(a) of the standard contract, which adopted as a test of its maintenance obligation expense the accounting rules of the Interstate Commerce Commission, and so allowances for undermaintenance were generally governed by a comparison of expenditures for upkeep during the period of Federal control with those made during a test period of the three years of private operation preceding June 30, 1917, save when exceptional circumstances brought about grossly unjust conclusions. (Report of the Director General of Railroads to the President of the United States, 1924.)

The final adjustments of the Railroad Administration with the present petitioners were lump sum settlements, as the result of which the Ann Arbor acknowledged an indebtedness of $600,000 to the Director General and the Director General acknowledged an indebtedness of $50,000 to the Lake Superior. The account

was closed by the Ann Arbor giving its notes for $550,000. The petitioners were not advised as to how the $600,000 liability was determined, and so all accounts with the United States upon their books were closed, the $600,000 set up as a debit, and remaining credits credited to profit and loss, in accordance with the accounting method prescribed by the Interstate Commerce Commission.

The petitioners contend that nothing was allowed by the Director General for undermaintenance since they received no money as the result of the settlement, but on the contrary were obliged to pay a large sum to the Director General. They support this contention by an analysis of their claims. The Ann Arbor demanded $1,208,534.34 for undermaintenance. It says that if this item had been allowed the net amount due it would have been $603,-601.26, but with it eliminated it owed $604,-933.08 to the Director General. Since its claim was compromised at $600,000, it draws the inference that the allowance was in settlement of that balance. A similar contention is made by the Lake Superior. Its claim for undermaintenance was $20,631.95, and if allowed it would have been entitled to receive $69,079.90. Since it was actually allowed but $50,000, it infers that its undermaintenance claim was totally disallowed. This assumes that all items of the claims, except those for undermaintenance, were allowed in full and that the undermaintenance items were wholly disallowed. There is no substantial evidence to support this assumption. It was not in accord with the practice of the Director General, and it is conceded by the railroads' representative at the conferences with him that there was no way to allocate the settlements to the various items of the claim, so that all that could be done was to close the accounts, set up the liability, and call the rest profit and loss.

Statistical studies to prove that the large expenditure for maintenance in the ten months of 1920 here involved was necessitated by current operating conditions, including unusual weather conditions, numerous derailments and breakdown of equipment, and excessive running repairs, failed to establish lack of rehabilitation during 1920, for there was no definite point of departure, and it was impossible to show actual condition at the beginning of the tax period. The Board

apprehended the real question to be whether maintenance performed in the 1920 period was that which actually belonged to the period of Federal control, for which the petitioners were reimbursed · by the Director General, and that this could not be answered by a mere comparison of general maintenance conditions at the beginning of the period with those · existing at its termination. It was, of course, impossible to exclude prior undermaintenance as a factor in excessive current maintenance. With this conclusion we agree, although we express no view of the Board's conclusion that the question could be answered only by an examination of particular items of maintenance performéd, an application of what the petitioners call the Board's "specific repair" theory.

■ But while rejecting the inferences drawn by the petitioners from claim analyses and statistical studies of operating conditions in 1920 to the effect that no money was received by the roads for undermaintenance, or if received was not expended in rehabilitation, the Board approved the Commissioner's determination that $574,191.51 of the maintenance account of the Ann Arbor and $23,979.75 of the maintenance account of the Superior were included in the allowances of the Director General for undermaintenance and expended in 1920, and this without supporting evidence · or persuasive analysis. It is now urged, arguendo, that an inference is warranted that certain items of the claims were undisputed and by assuming them to have been allowed in full there still remains some $648,000 which can be allocated to no other item of the claim than that for undermaintenance. But this ignores the fact that the whole settlement was a compromise, is the same kind of assumption rejected by the Board on behalf of the petitioners, leaves unexplained how the Commissioner arrived at his deductions, leaves likewise unexplained his segregation of the allowance as between undermaintenance of ways and undermaintenance of equipment, and compels the conclusion that his disallowances were purely arbitrary and without supporting evidence. Insofar as the respondent relies upon a letter written to him on May 8, 1925, by the comptroller of the Ann Arbor to the effect that if the roads had been properly maintained during the period of Federal control charges for maintenance would theoretically have been greater by the amount credited to profit and loss at the time of closing entries severing Federal transactions, it rises to the dignity · of evidence or of an admission against interest. It is but a conclusion made many years after the closing of the accounts by one who had no part in bringing about the settlements, whose authority to speak for the petitioners is not shown, and whose surmise does not accord with the fact · of compromise, the practice of the Director General in effecting it, and the accounting records, required and made. The position of the respondent that $648,000 of the allowance was on account of undermaintenance is just as untenable as the position of the petitioners that nothing was allowed on that account since neither is sustained by substantial evidence.

■ So concluding it would seem that the order of the Board should be reversed without remand. But the record, we think, discloses sufficient factual support for a determination of liability based neither upon the assumption that the railroads received nothing and expended nothing for undermaintenance, nor on the assumption that they received upwards of $648,000. The Board found that the Ann Arbor had expended for maintenance during the 1920 period $1,631,814. Its normal maintenance expenditure, based upon the equated test period, would have been, by the application of the accounting method used by the Director General, $151,092 less than that amount. It is a reasonable inference from the evidence that some amount was allowed by the Director General for undermaintenance during Government operation. The Ann Arbor claimed over $1,200,000 and its claim was compromised. It is likewise a reasonable inference that the Ann Arbor during the 1920 period expended some or all of this allowance for rehabilitation. A determination of such rehabilitation expenditure by the accounting test has been approved as reasonably accurate both by the courts and by the Board in previous cases. New York Central & St. L. R. R. Co. v. Helvering, 63 App.D.C. 247, 71 F.2d 956; Southern Railway Co. v. Commissioner, 4 Cir., 74 F.2d 887. The decisions of the Board are sufficiently cited in its present opinion. Its current departure from established practice is said by it to be ground-

ed upon the lack of evidence in the present case that the Director General failed in his contractual duties to maintain the petitioners' property adequately during Federal control. But the Board's very determination must necessarily rest upon a factual basis which embraces not only such failure but allowance of compensation therefor and its expenditure during the tax period. The evidence sustains its conclusion that there was such failure, however short it may fall in indicating the amount of the allowed compensation, and the application of the accounting method measures with reasonable accuracy the extent of the allowance used for restoration. The Ann Arbor's deduction for maintenance should have been reduced by $151,-092.29 and no more. Since the Lake Superior spent some $20,000 less for maintenance in 1920 than during the test period its deduction for maintenance should not be disallowed in any sum, nor should the Ann Arbor be permitted to avail itself of the amount by which the Superior's maintenance expense in 1920 fell short of its theoretical expense as determined by the accounting method, since the two roads were operated independently of each other and the accounting method must be applied to each independently.

The order of the Board is set aside and the cause remanded for the purpose of a new determination of tax liability consistent herewith.